UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

KYLE YOUNG,

              Plaintiff,

      v.

COMMISSIONER OF SOCIAL SECURITY,

              Defendant.

Case No. 1:22-cv-00161-CDB (SS)

ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

(Docs. 14, 15)

      Plaintiff Kyle Young ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits under the Social Security Act. (Doc. 1). The matter is currently before the Court on the Administrative Record ("AR") and the parties' briefs, which were submitted without oral argument. (Docs. 14, 15, 16).

## I.      BACKGROUND

### A. Administrative Proceedings and ALJ's Decision

      On December 30, 2019, Plaintiff filed an application for supplemental security income under Title XVI of the Social Security Act. (AR 185-194). Plaintiff's initial application was denied; upon reconsideration, it was once again denied. (AR 66, 77). On November 25, 2020, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 97-99). The

ALJ, Joyce Frost-Wolf, held a hearing on April 30, 2021, where Plaintiff and a vocational expert testified.  (AR 30-56).  On May 13, 2021, the ALJ issued her decision denying Plaintiff's claim.  (AR 14-25).  The Appeals Council denied Plaintiff's request for review on January 6, 2022.  (AR 1-3).  Plaintiff subsequently filed this action seeking judicial review of the ALJ's decision.  (Doc. 1).

After reviewing the evidence, the ALJ considered Plaintiff's claims using the five-step sequential evaluation required by 20 CFR § 404.1520(a)(4).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 30, 2019, the date of the application.  At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the cervical and lumbar spine, shoulder arthritis, carpal tunnel syndrome ("CTS"), and obesity.  She also determined that Plaintiff had further functional difficulties in the form of: high blood pressure, bunions on both feet, varicose veins, bad knees, and hiatal hernia.  She found no evidence in the file that these impairments caused more than minimal functional limitations for 12 months or longer, providing as an example that in September 2019, the Plaintiffs hypertension and varicose veins were clinically stable, with a general citation to Exhibit 3F.  (AR 19).

She found no evidence that, despite Plaintiff being a candidate for bunion deformity surgery, any such surgery was ever done nor were there treatment notes documenting continued complaints of bunion foot pain in 2020 and 2021, citing Exhibits 4F and 9F.  She provides that in November 2020, the most recent treatment record, Plaintiff's blood pressure was within normal limits and he was not on an anti-hypertensive medication, citing Exhibit 12F.  She concluded that high blood pressure, bilateral bunions, and varicose veins were non-severe impairments for purposes of her decision.  *Id.*  Regarding Plaintiff's bad knees and hernia, she found no objective medical evidence of evaluations, diagnoses, or treatments in the file and, as such, concluded under 20 CFR § 416.908 and § 416.903(a) that these were non-medically determinable impairments.  *Id.* at 20.

At step three, the ALJ concluded that Plaintiff does not have an impairment, nor combination of impairments, that meets or medically equals the severity of one of the listed

2

impairments in 20 CFR Part 404, Subpart P, Appendix 1.  She found that Plaintiff's back and neck impairments had not resulted in nerve root compromise, with appropriate imaging and clinical findings, as required by section 1.15 of the listings of impairments (disorders of the spine).  She also noted no presence of medical documentation that the Plaintiff's shoulder impairments have resulted in inability to use either extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements as set out in section 1.18D of the listings.  *Id.*

The ALJ noted that Plaintiff weighed approximately 297 pounds at the time of the application filing, which for a person of his height, corresponded to a Body Mass Index ("BMI") of 38.9, or moderate obesity under the clinical guidelines of the National Institutes of Health ("NIH"), citing to page 2 of Exhibit 2E.  She found no evidence in the file that Plaintiff's obesity aggravates his other impairments so much as to result in listing-level severity.  She concluded that, citing to Social Security Ruling ("SSR") 19-2p, while Plaintiff's obesity was a severe impairment, it did not, alone or in combination with other impairments, meet or medically equal a listed impairment.  *Id.*

At step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR § 416.967(b), except he was limited to jobs that could be performed either sitting or standing with an opportunity to alternate positions at 45-minute intervals.  Plaintiff could occasionally climb ramps and stairs but never ladders, ropes, or scaffolds.  Plaintiff could also only occasionally balance, stoop, crouch, kneel, and crawl. Plaintiff could occasionally push and pull with the upper extremities and frequently handle and finger bilaterally.  Finally, Plaintiff could have no work in environments with concentrated exposure to heavy machinery with fast moving parts or unprotected heights.  The ALJ noted that she had considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR § 416.929 and SSR 16-3p, and that she had considered the medical opinions and prior administrative medical findings in accordance with the requirements of 20 CFR § 416.920c.  *Id.*

3

1    When considering Plaintiff's symptoms, the ALJ noted that she must follow the two-step

2    process (presumably, as set forth in SSR 16-3p).  First, she must determine whether there is an

3    underlying medically determinable physical or mental impairment; namely, an impairment or

4    impairments that can be shown by medically acceptable clinical or laboratory diagnostic

5    techniques that could reasonably be expected to produce Plaintiff's pain or other symptoms.

6    Second, once an underlying physical or mental impairment(s) that could reasonably be expected

7    to produce Plaintiff's pain or other symptoms has been shown, she must evaluate the intensity,

8    persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they

9    limit Plaintiff's work-related activities.  For this purpose, whenever statements about the

10   intensity, persistence, or functionally limiting effects of pain or other symptoms are not

11   substantiated by objective medical evidence, she must consider other evidence in the record to

12   determine if Plaintiff's symptoms limit the ability to do work-related activities.  *Id.* at 21.

13   The ALJ noted the following medical findings: Plaintiff had alleged disability due to a

14   herniated intervertebral disc, spinal stenosis, and sciatica; she provided a citation to page 2 of

15   Exhibit 2E and a general citation to the hearing transcript.  In his disability report from January 3,

16   2020, Plaintiff indicated that he weighed approximately 287 pounds, which, for a person of his

17   height, corresponds to a BMI of 38.9, or "moderate" obesity under the clinical guidelines of the

18   NIH; the ALJ cites to page 2 of Exhibit 2E.  At the hearing, the ALJ stated that Plaintiff testified

19   that he spent his days alternating positions between standing, sitting, walking, and lying down due

20   to pain.  Plaintiff explained that he does activities in increments of 45 to 60 minutes followed by

21   rest.  If Plaintiff sits for more than an hour, his back becomes very stiff and he loses his balance

22   when he tries to get up.  Standing in one place also aggravates his back pain.  In addition, the ALJ

23   stated that Plaintiff had noticed that his grip is weak when he tries to pull wet clothes out of his

24   washer.  He also needs to switch hands every five minutes when he talks on the phone because

25   the holding hand goes tingly and numb.  She noted that Plaintiff has difficulty getting up from

26   squatting and has to use his hands.  *Id.*

27   In terms of treatment, Plaintiff was not taking any prescribed pain medication at the time

28   of the hearing because it "does not work"; the ALJ did not provide a citation for the source of this

quote.  The Court presumes the ALJ intended to refer to Plaintiff's testimony the pain medications "don't do anything" on page 14 of the hearing transcript (AR 45).  Specifically, over-the-counter pain medication "does not touch the pain," so he does not take any; the ALJ also did not provide a citation for the source of this quote.  The Court presumes the ALJ intended to refer to the phrase "doesn't even touch it" on page 13 of the hearing transcript (AR 44).  Instead, he uses heat, ice, an inversion table, braces, and rest to alleviate pain during the day; for this, the ALJ provides a general citation to the hearing transcript.  As for daily activities, the Plaintiff lives alone and is able to do household chores, with breaks every 30-60 minutes.  He is also able to care for his dogs and take them out for walks but needs a long-handle scooper to clean up after them as he is unable to bend and squat without pain.  Plaintiff also cannot sit and watch television for more than an hour at a time because his back becomes too stiff; for this, the ALJ provides a general citation to the hearing transcript.  She concluded that Plaintiff has described daily activities that support a remaining functional capacity for a range of light exertion.  *Id.*

The ALJ concluded that the objective findings in the case did not provide strong support for Plaintiff's allegations of disabling symptoms and limitations.  She found that the medical findings did not support the existence of limitations greater than those assessed above.  The ALJ concluded from the records that Plaintiff suffered an exacerbation in his chronic lower back pain and sciatica in June 2019, following a chiropractic adjustment; she cited to page 12 of Exhibit 2F. He first saw his family physician and was prescribed a short course of cyclobenzaprine (a muscle relaxer).  On exam at that time, Plaintiff appeared in mild distress and was unable to sit due to back pain.  His gait, she provided, was normal and he had intact range of motion in the lumbar spine.  *Id.*

No neurological deficits (namely, strength and sensation) were noted; the ALJ cited to pages 12 and 13 of Exhibit 2F.  *Id.* at 21-22.  A week later, Plaintiff sought emergency room care for the same problem.  An exam revealed costovertebral angle tenderness and right-sided lumbar paraspinal soft tissue tenderness.  Straight leg raising was positive at 45 degrees on the right and negative on the left.  Sensation and strength were unimpaired; the ALJ provided a general citation to Exhibit 1F.  She noted that an MRI scan of the lumbar spine, in turn, showed multilevel

degenerative disc disease, including multilevel disc bulging with moderate central canal stenosis at L1 and severe right neuroforaminal narrowing with encroachment of the existing right nerve root at L4-5; the ALJ cites to page 4 of Exhibit 1F.  Plaintiff was referred to neurology for further evaluation; she cites to page 16 of Exhibit 2F.  *Id.* at 22.

The ALJ cites to pages 17 to 19 of Exhibit 2F for the findings that Plaintiff had degenerative changes to his cervical spine, with moderate deformity of the thecal sac, moderate to severe foraminal narrowing, widening of the right AC joint, and moderate degenerative changes at the left acromioclavicular.  She notes Plaintiff visited a neurologist for pain complaints in August 2019.  At that visit, mild weaknesses were recorded in both lower extremities and Plaintiff was prescribed Cymbalta and referred to electromyogram and nerve conduction studies ("EMG/NCS") of the upper extremities; the ALJ cites to pages 6 and 7 of Exhibit 5F.  The EMG/NCS showed mild to moderate bilateral carpal tunnel syndrome and bilateral C5/C6 cervical radiculopathy; the ALJ cites to page 4 of Exhibit 5F.  *Id.*

The ALJ notes Plaintiff then saw a neurosurgeon in September 2019, but no immediate surgery was recommended.  The neurosurgeon concluded that Plaintiff's weight was exacerbating a lumbar spine sprain and recommended weight loss first.  Plaintiff's BMI at that time was 39.6. In December 2019, the filing date of the present application, Plaintiff returned to his neurologist and reported that he had not been doing well with respect to his pain.  He had scheduled to see a pain management specialist; the ALJ cites to page 1 of Exhibit 5F.  The neurologist prescribed Neurontin, in addition to Cymbalta; she cites to page 2 of Exhibit 5F.  She finds limited evidence of treatment after that.  *Id.*

In September 2020, Plaintiff had a consultative medical examination at the request of the Social Security Administration.  His exam was within normal limits except for tenderness over the ball of the right foot, in the area of the second and third metatarsal areas, and decreased sensation to touch in the right toes; the ALJ provides a general citation to Exhibit 8F.  Then, in November 2020, Plaintiff saw a family physician with complaints of joint pain with popping in the wrists, thumbs, and left elbow.  He also asked to see a new neurologist for bilateral foot neuropathy.  No concerning abnormalities were noted on exam, and Plaintiff was given a referral

1    to neurology; the ALJ provides a general citation to Exhibit 12F.  She notes that this is the last

2    available treatment note in the file.  *Id.*

3        The ALJ found that Plaintiff's medically determinable impairments could reasonably be

4    expected to cause the alleged symptoms; however, his statements concerning the intensity,

5    persistence and limiting effects of these symptoms were not fully supported by the preponderance

6    of the evidence of record.  She found the available imaging studies, including the MRI scans of

7    the lumbar and cervical spine, the X-rays of the shoulders, and the EMG/NCS of the upper

8    extremities showed a number of underlying abnormalities.  More recent physical exams had also

9    revealed slight compromises in strength and sensation in the lower extremities, especially on the

10   right side.  She noted Plaintiff's treatment history was minimal. She saw no evidence that he

11   tried physical therapy, injection therapy, or other pain management interventions since his lumbar

12   spine pain exacerbation in June 2019.  *Id.* at 23.

13       In September 2019, she noted surgery was not deemed urgent and there was no evidence

14   of neurosurgery follow-up since then. Plaintiff was not taking any pain medications at the time of

15   his disability hearing despite his allegations of severe pain and stiffness.  She noted there was also

16   no evidence of emergency room visits for uncontrolled pain after the June 2019 visit.  She found

17   that, without more evidence of attempted treatment, the RFC assessment above sufficiently

18   accommodated Plaintiff's subjective complaints, and any additional functional limitations are not

19   supported by the record at this time.  *Id.*

20       She provided that the state agency medical consultants (L. Pancho, M.D., and M. Yee,

21   M.D.) limited Plaintiff to lifting and carrying up to 20 pounds occasionally and 10 pounds

22   frequently, standing and walking for about six hours in a workday, occasional performance of all

23   postural activities except for no climbing of ladders, ropes, or scaffolds, and frequent bilateral

24   handling and fingering; she cited to page 7 and 8 of Exhibit 1A and 7 to 9 of Exhibit 3A.  She

25   found that this assessment was supported with a thorough review of the available records at the

26   time and that it was also consistent with the preponderance of the objective findings in the file,

27   including the diagnostic findings of abnormalities in the hands, shoulders, neck, and low back and

28   the clinical findings of some weakness and reduced sensation in the lower extremities, especially

1   on the right side; she cited to page 4 of Exhibit 1F, pages 17 and 18 of Exhibit 2F, page 4 of

2   Exhibit 5F, and cited generally to Exhibits 8F and 10F.  *Id.*

3   The ALJ concluded that the prior administrative medical findings were persuasive, except

4   she additionally found that limitations on work around hazards and allowance for position

5   changes are justified in this case due to evidence of weakness and diminished sensation in the

6   lower extremities; she cited generally to Exhibits 5F, 8F, and 10F.  The consultative medical

7   examiner (Birgit Siekerkotte, M.D.) found Plaintiff capable of lifting and carrying 50 pounds

8   occasionally and 25 pounds frequently; standing and walking up to six hours in a workday; and

9   frequent climbing, stooping, crouching, kneeling, and crawling; the ALJ cited to page 5 of

10  Exhibit 8F.  She found this assessment unpersuasive, noting it was not consistent with other

11  evidence in the file, including the MRI scans of the lumbar and cervical spine, the X-rays of the

12  shoulders, and the EMG/NCS of the upper extremities; she cited to page 4 of Exhibit 1F, pages 17

13  to 19 of Exhibit 2F, and page 4 of 5F.  *Id.*

14  At step five, the ALJ concluded that Plaintiff was unable to perform any past relevant

15  work.  Plaintiff had previously worked as a camera operator, found to be medium exertion as

16  generally performed under the relevant DOT standard and heavy as actually performed by

17  Plaintiff.  The ALJ based her decision on the testimony of the vocational expert, finding the

18  exertional demands of Plaintiff's past relevant work to exceed the RFC; she provides a general

19  citation to the hearing transcript.  *Id.*

20  The ALJ noted that Plaintiff, at age 49 at the time of filing of his initial application, was

21  then defined as a younger individual (ages 18 to 49) but subsequently turned 50 years of age and

22  therefore changed category, to closely approaching advanced age.  *Id.* at 23.  She noted Plaintiff

23  has at least a high school education and that transferability of job skills was not material since she

24  concluded Plaintiff was not disabled whether or not he had transferable job skills.  *Id.* at 24.

25  The ALJ cited to Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix

26  2 when noting the jobs that the vocational expert testified Plaintiff could perform, such as

27  photocopy machine operator, mail clerk, and office helper.  *Id.* at 24-25.  She provided that the

28  vocational expert testified that the Dictionary of Occupational Titles does not provide specific

1   information about different types of climbing (stairs or ladders) or about a sit or stand option for

2   listed occupations and that his testimony on this point was based on his professional experience

3   and knowledge of how representative occupations are generally performed in the economy; she

4   provides a general citation to the hearing transcript.  She concluded that the additional

5   information does not render the vocational expert's testimony inconsistent with the Dictionary of

6   Occupational Titles under SSR 00-4p.  *Id.* at 25.

7          Finally, the ALJ found that Plaintiff was capable of making a successful adjustment to

8   other work that exists in significant numbers in the national economy.  She determined that a

9   finding of "not disabled" was appropriate.  *Id.*

10          **B.  Medical Record and Hearing Testimony**

11         The relevant hearing testimony and medical record were reviewed by the Court and will

12   be referenced below as necessary to this Court's decision.

13   **II.       STANDARD OF REVIEW**

14         A district court's review of a final decision of the Commissioner of Social Security is

15   governed by 42 U.S.C. § 405(g).  The scope of review under § 405(g) is limited; the

16   Commissioner's decision will be disturbed "only if it is not supported by substantial evidence or

17   is based on legal error."  *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).  "Substantial

18   evidence" means "relevant evidence that a reasonable mind might accept as adequate to support a

19   conclusion."  *Id.* at 1159 (quotation and citation omitted).  Stated differently, substantial evidence

20   equates to "more than a mere scintilla[,] but less than a preponderance."  *Id.* (quotation and

21   citation omitted).  "It is such relevant evidence as a reasonable mind might accept as adequate to

22   support a conclusion."  *Healy v. Astrue*, 379 Fed. Appx. 643, 645 (9th Cir. 2010).  In determining

23   whether the standard has been satisfied, a reviewing court must consider the entire record as a

24   whole rather than searching for supporting evidence in isolation.  *Id.*

25         The court will review only the reasons provided by the ALJ in the disability determination

26   and may not affirm the ALJ on a ground upon which she did not rely.  Social Security Act § 205,

27   42 U.S.C. § 405(g).  In reviewing a denial of benefits, a district court may not substitute its

28   judgment for that of the Commissioner.  "The court will uphold the ALJ's conclusion when the

1    evidence is susceptible to more than one rational interpretation." *Tommasetti v. Astrue*, 533 F.3d

2    1035, 1038 (9th Cir. 2008).  Further, a district court will not reverse an ALJ's decision on account

3    of an error that is harmless.  *Id*.  An error is harmless where it is "inconsequential to the [ALJ's]

4    ultimate nondisability determination."  *Id*. (quotation and citation omitted).  The party appealing

5    the ALJ's decision generally bears the burden of establishing that it was harmed.  *Shinseki v.*

6    *Sanders*, 556 U.S. 396, 409-10 (2009).

7         **A.  Applicable Legal Standards**

8         A claimant must satisfy two conditions to be considered "disabled" within the meaning of

9    the Social Security Act.  First, the claimant must be "unable to engage in any substantial gainful

10   activity by reason of any medically determinable physical or mental impairment which can be

11   expected to result in death or which has lasted or can be expected to last for a continuous period

12   of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  Second, the claimant's impairment

13   must be "of such severity that he is not only unable to do his previous work[,] but cannot,

14   considering his age, education, and work experience, engage in any other kind of substantial

15   gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

16        The Commissioner has established a five-step sequential analysis to determine whether a

17   claimant satisfies the above criteria.  *See* 20 C.F.R. § 416.920(a)(4)(i)-(v).  At step one, the

18   Commissioner considers the claimant's work activity.  20 C.F.R. § 416.920(a)(4)(i).  If the

19   claimant is engaged in "substantial gainful activity," the Commissioner must find that the

20   claimant is not disabled.  20 C.F.R. § 416.920(b).

21        If the claimant is not engaged in substantial gainful activity, the analysis proceeds to step

22   two.  At this step, the Commissioner considers the severity of the claimant's impairment.  20

23   C.F.R. § 416.920(a)(4)(ii).  If the claimant suffers from "any impairment or combination of

24   impairments which significantly limits [his or her] physical or mental ability to do basic work

25   activities," the analysis proceeds to step three.  20 C.F.R. § 416.920(c).  If the claimant's

26   impairment does not satisfy this severity threshold, however, the Commissioner must find that the

27   claimant is not disabled.  *Id.*

28        At step three, the Commissioner compares the claimant's impairment to impairments

1    recognized by the Commissioner to be so severe as to preclude a person from engaging in

2    substantial gainful activity.  20 C.F.R. § 416.920(a)(4)(iii).  If the impairment is as severe or more

3    severe than one of the enumerated impairments, the Commissioner must find the claimant

4    disabled and award benefits.  20 C.F.R. § 416.920(d).

5         If the severity of the claimant's impairment does not meet or exceed the severity of the

6    enumerated impairments, the Commissioner must pause to assess the claimant's "residual

7    functional capacity."  Residual functional capacity (RFC), defined generally as the claimant's

8    ability to perform physical and mental work activities on a sustained basis despite his or her

9    limitations (20 C.F.R. § 416.945(a)(1)), is relevant to both the fourth and fifth steps of the

10   analysis.

11        At step four, the Commissioner considers whether, in view of the claimant's RFC, the

12   claimant is capable of performing work that he or she has performed in the past (past relevant

13   work).  20 C.F.R. § 416.920(a)(4)(iv).  If the claimant is capable of performing past relevant

14   work, the Commissioner must find that the claimant is not disabled.  20 C.F.R. § 416.920(f).  If

15   the claimant is incapable of performing such work, the analysis proceeds to step five.

16        At step five, the Commissioner considers whether, in view of the claimant's RFC, the

17   claimant is capable of performing other work in the national economy.  20 C.F.R. §

18   416.920(a)(4)(v).  In making this determination, the Commissioner must also consider vocational

19   factors such as the claimant's age, education, and past work experience.  *Id*.  If the claimant is

20   capable of adjusting to other work, the Commissioner must find that the claimant is not disabled.

21   20 C.F.R. § 416.920(g)(1).  If the claimant is not capable of adjusting to other work, the analysis

22   concludes with a finding that the claimant is disabled and is therefore entitled to benefits.  *Id.*

23        The claimant bears the burden of proof at steps one through four above.  *Tackett v. Apfel*,

24   180 F.3d 1094, 1098 (9th Cir. 1999).  If the analysis proceeds to step five, the burden shifts to the

25   Commissioner to establish that (1) the claimant is capable of performing other work; and (2) such

26   work "exists in significant numbers in the national economy."  20 C.F.R. § 416.960(c)(2); *Beltran*

27   *v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012).

28   ///

1    **III.    ISSUES AND ANALYSIS**

2          Plaintiff seeks judicial review of the Commissioner's final decision denying his

3    application for SSI.  (Doc. 1).  Plaintiff raises two issues in his motion for summary judgment: (1)

4    The ALJ failed to provide clear, convincing, and well-supported reasons for discounting

5    Plaintiff's allegations of pain and physical dysfunction and (2) the ALJ failed to adequately

6    evaluate the limiting effects of Plaintiff's obesity.  (Doc. 14 at 6).

7          **A.  Whether the ALJ Failed to Provide Clear, Convincing, and Well-Supported**

8                **Reasons for Discounting Plaintiff's Allegations of Pain and Physical Dysfunction**

9          "In assessing the intensity and persistence of symptoms, the ALJ must consider a

10   claimant's daily activities; the location, duration, frequency, and intensity of the pain or other

11   symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects

12   of medication taken to alleviate pain or other symptoms; treatment, other than medication

13   received for relief of pain or other symptoms; any other measures used to relieve pain or other

14   symptoms; and other factors concerning a claimant's functional limitations and restrictions due to

15   pain or other symptoms." *Christine G. v. Saul*, 402 F. Supp. 3d 913, 921 (C.D. Cal. 2019) (citing

16   20 C.F.R. § 416.929).

17         Plaintiff argues that he did not allege his back pain rendered him totally incapacitated and

18   he was not required to do so to establish entitlement to benefits.  (Doc. 14 at 6).  He argues that

19   the ALJ did not provide clear and convincing reasons in rejecting his symptom testimony.  *Id.* at

20   7.  He provides that he had used physical therapy, chiropractic treatment, and narcotic pain

21   medications to attempt to alleviate pain in the past with little success, as outlined in the medical

22   records of his neurosurgeon, who found him to be a surgical candidate.  *Id.* at 8.  Finally, Plaintiff

23   states that the medical record contained ample diagnostic evidence to support Plaintiff's reported

24   symptoms and the rest breaks and accommodations he needed to accomplish his daily tasks.  *Id.*

25   at 9.

26         An ALJ's reasons for rejecting a claimant's subjective symptom statements must be

27   specific, clear, and convincing.  General findings regarding a claimant's credibility are

28   insufficient; rather, the ALJ must identify what testimony is not credible and what evidence

12

undermines the claimant's complaints.  The ALJ's findings must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.  A reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain.  As such, an implicit finding that a plaintiff's testimony is not credible is insufficient.  *Christine G.*, 402 F. Supp. 3d at 921-922 (citations and quotations omitted).  The standard is "not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases."  *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017).

The ALJ calls into question Plaintiff's credibility in regards to his symptoms of pain.  The primary foundation she provides for this is the lack of emergency room visits for pain; no evidence that Plaintiff had tried physical therapy, injection therapy, or other pain management interventions since his lumbar spine pain exacerbation in June 2019; Plaintiff not taking any pain medications at the time of the hearing; and no evidence of a neurosurgery follow-up.  (AR 23).  She found that, without more evidence of attempted treatment, the light exertion RFC assessment sufficiently accommodated the Plaintiff's subjective complaints, and any additional functional limitations were not supported by the record at that time.  (AR 23).

### 1.  Course of Treatment

#### i.  Pain Medication

Although an "unexplained or inadequately explained failure" to seek treatment or follow prescribed treatment can be a valid reason to discount a claimant's testimony, the ALJ is required to consider plaintiff's reasons for not taking medications.  *Trevizo*, 871 F.3d at 679-80.  Here, the ALJ did not adequately consider Plaintiff's reasons for not taking pain medication.

In his hearing testimony, Plaintiff testified that aspirin and other similar medications do not help with his pain.  He may be referring, as well, to morphine not helping with his pain either, though he does not name the drug specifically.  He notes fentanyl is the only thing that helped; he may have been specifically referring to medications only in this portion of the questioning, as opposed to other methods of pain management, but the record is unclear.  (AR 44).

The medical record shows that Plaintiff has taken numerous pain medications over significant lengths of time. Exhibit 5F records three visits by Plaintiff to neurologist Jian C. Lin. The first is dated August 12, 2019, the second September 30, 2019, and the third December 16, 2019. (AR 311-317). Dr. Lin notes that, during the first visit, Plaintiff presented for evaluation of back and neck pain. Plaintiff is prescribed 30 milligram Cymbalta in caplet form to take once a day, with three refills. (AR 317).

After the first visit, on September 16, 2019, Plaintiff had an appointment with neurosurgeon Bjorn M. Lobo, who noted that Plaintiff was currently taking albuterol, cyclobenzaprine HCI, ibuprofen, methylprednisolone, morphine, and Tylenol. (AR 347). Though duloxetine and gabapentin are not mentioned, this suggests Plaintiff was taking multiple pain medications at least up to the point of this visit, multiple months after June 2019, likely evidencing a continued effort to manage pain. (AR 347).

During the second visit with Dr. Lin, the records provide that "[s]ince last seen patient has not been well. Patient states he is still having neck and back pain. … Patient denies taking medication for the pain. Patient states he went to a back surgeon to see his options . . . told that he is a candidate for past [sic] surgery but need to loosing [sic] weight before surgery." (AR 313). Dr. Lin increased Plaintiff's dosage of Cymbalta from 30 milligram per caplet to 60 milligram per caplet, to be taken once a day with four refills. (AR 314).

During the third visit, Dr. Lin records that Plaintiff "has not been well. Patient states he is still having the neck and back pain. … Patient denies taking medication for the pain. Patient is currently dieting and trying to lose weight to help with his pain." He then notes, "Patient has scheduled for pain clinic." (AR 311). Dr. Lin then refills Plaintiff's 60 milligram Cymbalta prescription, with four additional refills, and prescribes Neurontin at 300 milligrams per capsule with three refills, with a follow-up visit set for three months later. (AR 312).

As the medical records were prepared on January 30, 2020 (AR 322), they do not include any records from further follow-ups. However, an additional request for records to Kern County Neurological Medical Group on April 27, 2020 resulted in a return of the form with a notation stating the date of the last appointment was December 16, 2019, indicating Plaintiff had not yet

1  returned for a follow-up.  (AR 324-325).  During the hearing, Plaintiff mentioned communication

2  issues with Dr. Lin and said he had recently switched to a different neurologist.  (AR 50).

3      Dr. Lin notes that Plaintiff denied taking medication for the pain in both follow-up

4  appointments.  This may suggest Plaintiff was not taking the prescribed medications.  However,

5  this is unclear, as Dr. Lin then refills Plaintiff's Cymbalta prescription at a higher dose in the first

6  recorded follow-up, and then adds Neurontin on top of Cymbalta in the second follow-up.  This

7  suggests Plaintiff may have been taking his prescribed medications, and Dr. Lin may have been

8  referring to other medications, such as those able to be purchased over-the-counter.  Plaintiff did

9  mention during the hearing that his neurologist gave him duloxetine (Cymbalta) and gabapentin

10  (Neurontin), which he tried, but they did not do anything and that he had learned they simply

11  "mask the condition anyway."  (AR 45).

12      A medical appointment regarding a skin lesion, dated August 12, 2019, notes "no known

13  medications."  (AR 352).  However, the consultative exam records, dated September 8, 2020 and

14  prepared by Dr. Siekerkotte, note Plaintiff's "current medications" as duloxetine and gabapentin

15  (AR 336).  And the most recent medical records, from a family medicine physician and dated

16  November 16, 2020 (AR 361-364), note Plaintiff taking albuterol, cyclobenzaprine, doxycycline,

17  methylprednisolone, and morphine.  This suggests Plaintiff was possibly again taking pain

18  medications.  (AR 362).

19      Plaintiff's proffered reason for not taking pain medications during the hearing was their

20  ineffectiveness.  (AR 44-45).  Plaintiff relies on *Orn v. Astrue* (495 F.3d 625 (9th Cir. 2007)) for

21  the proposition that a "claimant's failure to follow or pursue a prescribed course of treatment

22  cannot be the basis for an adverse credibility finding where the claimant has a good reason for not

23  doing so."  (Doc. 14 at 7-8).  In *Orn*, the Ninth Circuit held that the ALJ erred in finding that the

24  claimant's credibility was undermined by failure to follow a specific diet regarding obesity that

25  was outlined in patient discharge instructions.  The Ninth Circuit explained that in "the case of

26  impairments where the stimulus to seek relief is less pronounced, and where medical treatment is

27  very unlikely to be successful, the approach to credibility makes little sense."  *Orn,* 495 F.3d at

28  638.  The Ninth Circuit explained, for example, the if the claimant failed to seek treatment or

1    follow prescribed treatment for the condition of disabling pain, an ALJ may use such failure as a

2    basis for finding that complaint exaggerated or unjustified.  *Id.*

3         In a later case, the Ninth Circuit discussed credibility as regards to failure to take pain

4    medications.  *See Trevizo*, 871 F.3d at 664.  In *Trevizo*, the ALJ weighed against a claimant's

5    credibility her failure to take narcotic medications to alleviate pain.  The Ninth Circuit held that

6    the ALJ failed to consider the plaintiff's reasons for doing so.  "The ALJ did not address the

7    believability of Trevizo's proffered reasons: her fear of becoming addicted to narcotics and the

8    ability of alternate drugs to control her pain.  The ALJ's weighing of Trevizo's failure to take

9    narcotics against her credibility was thus erroneous."  *Id.* at 679-680.

10        While in many cases unexplained refusal to treat reported pain with medication could call

11   into question a claimant's credibility, here, Plaintiff discontinued use because he found the

12   medications to be ineffective and the record shows extensive attempts at using such medications.

13   The ALJ did not meet the applicable clear and convincing standard in merely citing but failing to

14   consider and address Plaintiff's proffered reasons for not taking pain medications, namely their

15   ineffectiveness, as required under *Orn* and *Trevizo*.  *See Stuter v. Astrue,* No. CIV S-08-0129

16   DAD, 2009 WL 2824740, at *5 (E.D. Cal. Sept. 1, 2009) ("Where a claimant provides evidence

17   of a good reason for not taking medication for her symptoms, her symptom testimony cannot be

18   rejected for not doing so.").

19        Defendant argues that the ALJ properly discounted Plaintiff's testimony for the following

20   reasons: (1) Plaintiff's pain treatment was conservative; (2) he references "instances" of using

21   pain medication, such as morphine, but that was in response to a single exacerbation of his back

22   pain and his provider did not add it for regular pain relief; (3) the hospital denied his request for

23   fentanyl patches; (4) and Plaintiff admitted gabapentin "masked" his pain, suggesting it did

24   provide some relief, but Plaintiff did not take it because it did not "cure" his pain.  (Doc. 15 at 12-

25   13).  However, the ALJ did not elaborate as such in her decision and thus the record is

26   undeveloped as to these arguments.  A court can "review only the reasons provided by the ALJ in

27   the disability determination and may not affirm the ALJ on a ground upon which [she] did not

28   rely."  *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

1    In sum, the ALJ failed to adequately consider Plaintiff's reasons regarding his failure to

2    take pain medication and, as such, erroneously weighed that factor against his credibility.

### ii.  Physical Therapy

4    Dr. Lin recorded that Plaintiff was scheduled for a "pain clinic" and dieting in an attempt

5    to lose weight to help with his pain.  The latter is likely in response to his neurosurgical

6    appointment, during which Dr. Lobo informed Plaintiff that his obesity may be exacerbating his

7    back issues and resulting pain.  (AR 348).

8    During that appointment on September 16, 2019, Dr. Lobo noted that he believed that

9    "weight gain is his most pressing issue.  I have spent over 40 minutes discussing and counseling

10    him with weight loss and weight related issues including diet.  I highly recommended the patient

11    be evaluated by dietitian for long-term weight loss."  (AR 348).  After discussing Plaintiff's

12    varied sources of pain, Dr. Lobo also reported Plaintiff had used "[p]hysical therapy, [n]arcotics,

13    [c]hiropractor, and these therapies have not provided sufficient relief."  (AR 347).

14    The ALJ noted the record included no evidence that Plaintiff had tried physical therapy,

15    injection therapy, or other pain management interventions since his lumbar spine pain

16    exacerbation in June 2019.  (AR 23).  However, as evidenced by the content of the medical

17    records described above, it may be that Plaintiff was taking medications prescribed by Dr. Lin

18    after June 2019, which would evidence actions Plaintiff was taking to manage his pain,

19    potentially up to and after December 2019.  Further, Dr. Lin's records reflect Plaintiff saw a

20    chiropractor and scheduled an appointment for a pain management clinic.  (AR 311, 316).

21    Additionally, Plaintiff's attempt to lose weight to help with his pain could be regarded as further

22    evidence of a pain management strategy, as weight loss was specifically mentioned by his

23    neurosurgeon as a means to potentially alleviate the back issues causing a significant amount of

24    pain.  (AR 348).  Finally, his neurosurgeon also noted other methods Plaintiff had used to relieve

25    pain, without success, specifically mentioning physical therapy.  (AR 347).

26    The ALJ appears to have weighed against Plaintiff's credibility the fact that he did not

27    pursue physical therapy.  However, the record demonstrates that Plaintiff did pursue physical

28    therapy sometime prior and it was found to be ineffective.  The ALJ erred by not discussing this

1   in her decision and incorrectly assigning against Plaintiff's credibility that he purportedly did not

2   pursue physical therapy.

3                    **iii.  Other Methods of Pain Management**

4         Plaintiff notes numerous other methods he uses, or used in the past, in attempts to alleviate

5   his pain.  During the hearing, Plaintiff provided he used ice packs and heating pads, namely

6   Salonpas patches which he keeps in his wallet.  He also stated he previously used a table with

7   rollers underneath that are used by chiropractors, which helped his pain, but can no longer use it

8   due to a problem in the fifth vertebrae of his back.  He mentions purchasing a hot tub and using

9   an inversion table.  He also mentions braces, compression devices for his knees, and a

10  weightlifting belt when doing yardwork or moving items.  (AR 43).  He provides he uses ice

11  packs and heating patches daily.  (AR 44).

12       An ALJ satisfies the clear and convincing reasons standard to discount a claimant's

13  symptomology testimony only where she identifies the testimony she considers not credible and

14  what evidence undermines the claimant's complaints.  *See Smolen v. Chater*, 80 F.3d 1273, 1284

15  (9th Cir. 1996); *Leusch v. Berryhill*, 358 F. Supp. 3d 896 (D. Ariz. 2019); *Stuter*, 2009 WL

16  2824740, at *5.  Here, the ALJ briefly mentioned a number of Plaintiff's pain management

17  methods in a single sentence (AR 21) but did not elaborate further on whether or not they were

18  considered or rejected and the reasons for her conclusions.  As such, the ALJ's analysis was

19  insufficient and she failed to develop the record.

20                    **2.  Daily Activities**

21       Plaintiff argues that his statements regarding his daily activities were not at odds with his

22  disability claim.  He states that he testified to the fact that he took breaks between daily activities

23  "at least every 60 minutes" and "thus, it follows that Plaintiff's testimony regarding his daily

24  activities supported a need for four unscheduled rest breaks during an eight-hour work period in

25  addition to normally scheduled work breaks."  He states that the vocational expert testified that

26  "even an additional two 15-minute rest periods would prevent Plaintiff from performing

27  competitive work."  (Doc. 14 at 9).

28       The ALJ was permitted to consider daily living activities in her credibility analysis.  The

Ninth Circuit has explained that "if a claimant engages in numerous daily activities involving skills that could be transferred to the workplace, the ALJ may discredit the claimant's allegations upon making specific findings relating to those activities." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005); *see Morgan v. Apfel*, 169 F.3d 595, 600 (9th Cir. 1999) (finding that claimant's ability to fix meals, do laundry, work in the yard, and occasionally care for his friend's child was evidence of claimant's ability to work). Daily activities may be grounds for an adverse credibility finding if a claimant is able to spend a substantial part of his day engaged in pursuits involving capacities that are transferable to a work setting. *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012). However, "the mere fact that a plaintiff has carried on certain daily activities … does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001). When discounting a claimant's daily activities, an ALJ must explain "*which* daily activities conflicted with *which* part of [c]laimant's testimony." *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (emphasis in original).

During the hearing, Plaintiff provided that he "breaks things up into 45 minutes to an hour kind of ordeals." (AR 40). He also states that "I could probably walk the dogs for a half an hour to 45 minutes. But to stand in the same place, like – like in a trade show, again, there's no way." (AR 41). In her decision, the ALJ described Plaintiff's daily activities as follows:

> As for daily activities, the claimant lives alone and is able to do household chores, with breaks every 30-60 minutes. He is also able to care for his dogs and take them out for walks, but needs a long-handle poop scooper to clean after them as he is unable to bend and squat without pain. The claimant also cannot sit and watch television for more than an hour at a time because his back becomes too stiff. In short, the claimant has described daily activities that support a remaining functional capacity for a range of light exertion.

(AR 21) (citation omitted).

She discusses limitations to his daily activities in the preceding paragraph:

> At the hearing, the claimant testified that he spends his days alternating positions between standing, sitting, walking, and lying down due to pain. He explained that he does activities in increments of 45 to 60 minutes followed by rest. If he sits for more than an hour, his back becomes very stiff and he loses his balance when he tries to get up. Standing in one place also aggravates his back pain. In addition, the claimant has noticed that his grip is weak when he tries to pull wet clothes out of

19

his washer. He also needs to switch hands every five minutes when he talks on the phone because the holding hand goes tingly and numb. Furthermore, he has difficulty getting up from squatting and has to [use] his hands.

*Id.*

The ALJ may rely on the testimony of a vocational expert to assess whether a claimant can perform any other work existing in significant numbers in the national economy, but the ALJ is required to pose a hypothetical question that includes all of claimant's limitations that are supported by substantial evidence in the record. *See Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993). If the ALJ's hypothetical to the vocational expert does not incorporate all of a claimant's limitations or is not supported by substantial evidence in the record, the vocational expert's testimony has no evidentiary value. *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984). The Ninth Circuit has held "that in order for an ALJ to rely on a job description in the Dictionary of Occupational Titles that fails to comport with a claimant's noted limitations, the ALJ must definitively explain this deviation." *Pinto v. Massanari*, 249 F.3d 840, 847 (9th Cir. 2001).

During the hearing, the ALJ provided two hypotheticals to the vocational expert regarding jobs available to be performed in the national economy. The first hypothetical required an opportunity to alternate physical positions, such as between sitting and standing, every 45 minutes. It is for this hypothetical that the vocational expert provided the job positions of photocopy machine operator, mail clerk non-postal, and office helper (AR 52-53) that the ALJ utilized in making her disability decision (AR 24-25).

The second hypothetical the ALJ posed to the vocational expert added the condition that the claimant required two additional breaks during the workday, taken on an unscheduled basis for 15 minutes each to address a medical condition. With this condition, the vocational expert provided that there would be no jobs available. (AR 53-54). Plaintiff's counsel then asked the vocational expert a hypothetical posing the condition that the claimant would need to miss more than two days per month on a consistent basis. The vocational expert provided that there would not be sustainable employment in the national economy. (AR 55).

Though the ALJ provided a review of the medical evidence when determining her RFC

1    limitations (AR 21-23) and summarized Plaintiff's claimed limitations regarding daily activities

2    (AR 21), it is clear she did not incorporate Plaintiff's testimony (as she characterized it) regarding

3    his need to rest every 45 to 60 minutes during his daily activities.  If she had done so, thereby

4    requiring multiple additional breaks in a work setting, it appears from the hypotheticals posed to

5    the vocational expert that there may not be any sustainable employment available in the national

6    economy.  The ALJ did not describe why this limitation was not credible with sufficient

7    specificity to allow this Court to conclude that the ALJ rejected the testimony on permissible

8    grounds and did not do so arbitrarily.  *See Burrell*, 775 F.3d at 1138 ("To support a lack of

9    credibility finding, the ALJ was required to point to specific facts in the record …").

10        Defendant argues that Plaintiff testified that "he alternated between activities such as

11   chores and watching television *in order* to change positions" and, in fact, did not testify that he

12   needed to alternate positions and take breaks.  (Doc. 15 at 8-9) (emphasis in original).  Defendant

13   argues that, as such, the ALJ "fully accounted for Plaintiff's claim that he could only sit or stand

14   for 45 minutes at a time" by incorporating that limitation in the RFC.  *Id.* at 8.  However, this is

15   not what the ALJ summarized in her decision, as noted above: "He explained that he does

16   activities in increments of 45 to 60 minutes followed by rest."  (AR 21).  The ALJ did not

17   elaborate in her decision and thus the record is undeveloped as to the Defendant's points.  As

18   noted *supra*, a court can "review only the reasons provided by the ALJ in the disability

19   determination and may not affirm the ALJ on a ground upon which [she] did not rely."  *Garrison*,

20   759 F.3d at 1010.

21        **B.  Whether the ALJ Failed to Adequately Evaluate the Limiting Effects of**

22             **Plaintiff's Obesity**

23        Plaintiff asserts that the ALJ failed to address in her decision whether Plaintiff's obesity

24   resulted in additional functional work restrictions.  Plaintiff argues that the ALJ did not explain

25   how she reached her conclusion regarding whether obesity caused any physical limitations nor

26   did she evaluate obesity when considering the supportability of Plaintiff's symptom testimony

27   and his reported need for rest breaks.  Plaintiff argues this constituted harmful legal error because

28   it prevents this Court from engaging in meaningful review.

1    Under the Commissioner's governing Social Security Ruling ("SSR"), the functional

2    limitations caused by the MDI of obesity, alone or in combination with another impairment(s),

3    may medically equal a listing if, for example, obesity increases the severity of a coexisting or

4    related impairment(s) to the extent that the combination of impairments medically equals a

5    listing." *C.C. v. O'Malley*, No. 23-CV-00408-LJC, 2024 WL 1354437, at *4 (N.D. Cal. Mar. 28,

6    2024) (citing SSR 19-2p, Titles II & XVI: Evaluating Cases Involving Obesity; quotations

7    omitted).  "Under the SSR, the Social Security Administration will not make general assumptions

8    about the severity or functional effects of obesity combined with another impairment(s), but

9    instead evaluates each case based on the information in the case record to determine how obesity

10   affects other impairments."  *Id.*  "As with any other impairment, the Social Administration must

11   explain how it reached its conclusion on whether obesity causes any limitations."  *Id*.

12    Besides determining obesity to be one of Plaintiff's severe impairments (AR 19), the ALJ

13   discusses Plaintiff's obesity only once in her decision, as follows:

14        Finally, the claimant has indicated that he weighed approximately 297 pounds at
           the time of the application filing, which for a person of his height, corresponds to a
15         Body Mass Index (BMI) of 38.9, or moderate obesity under the clinical guidelines
           of the National Institutes of Health (NIH) (2E/2).  There is, however, no evidence
16         in the file that the claimant's obesity aggravates his other impairments so much as
           to result in listing-level severity.  Therefore, consistent with Social Security Ruling
17         19-2p, I conclude that, while the claimant's obesity is a severe impairment, it does
           not, alone or in combination with other impairments, meet or medically equal a
18         listed impairment.  (AR 20).
19

20    However, as noted in section III(A) above, Plaintiff's neurosurgeon, Bjorn M. Lobo,

21   informed Plaintiff that his obesity may be exacerbating his back issues and resulting pain.  (AR

22   348).  During that appointment, on September 16, 2019, Dr. Lobo noted that he believed that

23   "weight gain is his most pressing issue.  I have spent over 40 minutes discussing and counseling

24   him with weight loss and weight related issues including diet.  I highly recommended the patient

25   be evaluated by dietitian for long-term weight loss."  (AR 348).

26    Dr. Lobo noted Plaintiff's BMI of 39.6 at the time and provided in strong language that he

27   felt that Plaintiff's weight was a primary contributor to his back problems and pain, in a

28   paragraph relating to "[l]umbar stenosis" as follows: "I believe the patient is likely having low

22

1  back strain with intermittent leg pain secondary to his excessive weight causing strain on his

2  lumbar spine." (AR 348). As the ALJ concluded, degenerative disc disease of the cervical and

3  lumbar spine is a severe impairment (AR 19) and Dr. Lobo's medical records reflect that

4  Plaintiff's obesity may aggravate this other impairment. Additionally, obesity and weight gain

5  are also noted as "active problem[s]" in the most recent medical records in the transcript, dated

6  November 16, 2020. (AR 362). The ALJ did not address these points in her decision and thus

7  the record is undeveloped.

8        An ALJ's mere acknowledgment of obesity as a severe impairment is insufficient when

9  the ALJ fails to provide "meaningful analysis" to "explain how Plaintiff's obesity impacts her

10  other impairments or why he does not factor Plaintiff's obesity in her RFC assessment." *Mary*

11  *Elizabeth C. v. Saul*, No. CV 19-3723-KS, 2020 WL 2523116, at *16 (C.D. Cal. May 18, 2020)

12  (citing *Celaya v. Halter*, 332 F.3d 1177, 1182 (9th Cir. 2003)). *See Yolanda P. v. Kijakazi*, No.

13  1:20-cv-03245-JAG, 2022 WL 17248127, at *4 (E.D. Wash. Sept. 30, 2022) (holding that ALJ's

14  failure to address what effects plaintiff's obesity had on her knee impairments supported remand,

15  notwithstanding ALJ's conclusory assertion that a restriction to sedentary work with additional

16  conditions sufficiently accommodated any limitations caused by obesity); *Ramirez v. Berryhill*,

17  No. SACV 17-0417 (KS), 2018 WL 2392155, at *11 (C.D. Cal. May 25, 2018) ("[t]he ALJ found

18  obesity to be a severe impairment, but offers no explanation of how that impairment impacts

19  Plaintiff's other impairments and no explanation for why obesity is not discussed").

20        Accordingly, given the connection noted in the medical records between Plaintiff's back

21  issues and his obesity, the ALJ's failure to address obesity as a severe impairment in combination

22  with Plaintiff's other impairments is legal error that is not harmless.

23                 *     *     *     *     *

24        In sum, the ALJ has failed to meet the requirement to articulate clear and convincing

25  reasons to reject the Plaintiff's pain and symptom testimony and to explain her conclusions in

26  regards to Plaintiff's obesity.

27        The decision whether to remand for further proceedings or simply to award benefits is

28  within the discretion of the Court. *See Salvador v. Sullivan*, 917 F.2d 13, 15 (9th Cir. 1990).

1   Remand for further proceedings is warranted where additional administrative proceedings could

2   remedy defects in the decision.  *See Kail v. Heckler*, 722 F.2d 1496, 1497 (9th Cir. 1984).

3   Remand for the payment of benefits is appropriate where no useful purpose would be served by

4   further administrative proceedings (*Kornock v. Harris*, 648 F.2d 525, 527 (9th Cir. 1980)); where

5   the record has been fully developed (*Hoffman v. Heckler*, 785 F.2d 1423, 1425 (9th Cir. 1986));

6   or where remand would unnecessarily delay the receipt of benefits to which the disabled Plaintiff

7   is entitled (*Bilby v. Schweiker*, 762 F.2d 716, 719 (9th Cir. 1985)).

8          Here, Plaintiff seeks an order from the Court reversing the ALJ's decision and remanding

9   for further administrative proceedings (Doc. 14 at 12), and the Commissioner argues that the

10  Court should affirm the ALJ's decision finding Plaintiff not disabled (Doc. 15 at 16).  The Court

11  concludes that remand for further proceedings is warranted because additional administrative

12  proceedings may remedy the deficiencies in the ALJ's decision noted herein.

13  **IV.    CONCLUSION**

14         For the reasons set for above, the Court finds the ALJ erred in evaluating opinions in the

15  record and failed to apply the proper legal standards.  Accordingly, IT IS HEREBY ORDERED

16  that:

17         1.  Plaintiff's motion for summary judgment (Doc. 14) is **GRANTED**.

18         2.  Defendant's cross-motion for summary judgment (Doc. 15) is **DENIED.**

19         3.  This matter is **REMANDED** pursuant to sentence four of 42 U.S.C. §405(g) for further

20             proceedings consistent with this decision; and

21         4.  The Clerk of the Court is **DIRECTED** to enter judgment in favor of Plaintiff Kyle Young

22             and against Defendant Commissioner of Social Security.

23  IT IS SO ORDERED.

24  Dated:   **December 20, 2024**                          _____

25                                                          UNITED STATES MAGISTRATE JUDGE

26

27

28